IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PATRECE A. DRAPER, O.B.O.<br>R.O., a minor, | ) <br> ) <br> ) | CASE NO. 3:11CV2287 |
| Plaintiff, | ) <br> ) | JUDGE JAMES G. CARR |
| v. | ) <br> ) <br> ) | MAGISTRATE JUDGE<br>KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE,<br>Commissioner of Social Security, | ) <br> ) <br> ) | |
| Defendant. | ) <br> ) | **REPORT AND RECOMMENDATION** |

Plaintiff Patrece A. Draper ("Plaintiff"), as the mother and legal guardian of R.O., a minor child, ("Claimant"), seeks judicial review of the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security (the "Commissioner"), ordering the cessation of childhood Supplemental Security Income ("SSI") benefits previously awarded to Claimant under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. (The "Act").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

The Administrative Law Judge ("ALJ") erred under Step Three of the analysis for continued eligibility for childhood benefits because he failed to conduct a meaningful review of the medical evidence of record for Claimant's asthma, a severe impairment, in relation to the relevant Listed Impairment.  For that and the other reasons set forth below, the final decision of the Commissioner should be **REVERSED and REMANDED**.

### I.  Procedural History

Born on November 15, 2003, Claimant was delivered prematurely and was diagnosed as having a low birth weight.  Tr. 102-03.  Shortly thereafter, on November 17, 2003, Plaintiff filed

1

an application on Claimant's behalf for childhood SSI.  Tr. 103-08, 109.  This claim was approved on February 11, 2004, and Claimant was found disabled as of November 1, 2003, due to her low birth weight.  Tr. 54.

In May 2007, the Commissioner initiated a Continuing Disability Review ("CDR") to determine whether Claimant continued to be disabled.  Tr. 41-42.  Based on this review, on August 10, 2007, when the Claimant was 3 years old, the Commissioner issued a Cessation of Disability notice, finding that Claimant was no longer disabled as of August 1, 2007, due to improvements in her health, and ordering that her SSI benefits would cease.  Tr. 43-48.  Plaintiff challenged this determination, arguing that her daughter continued to be disabled after August 1, 2007, due to asthma, bladder spasms, and a seizure disorder.  Tr. 65, 78-79, 94, 287-92.  On April 15, 2009, the cessation of benefits was upheld upon reconsideration.  Tr. 49-61.  On June 18, 2009, Plaintiff requested a hearing before an ALJ.  Tr. 62-63.  A hearing was held on September 10, 2010, before Administrative Law Judge James H. Packer.  Tr. 282-293.  On September 17, 2010, the ALJ issued an unfavorable decision, finding that Claimant's disability ended as of August 1, 2007, and that Claimant had not become disabled again since that date.  Tr. 12-32.  Plaintiff requested review of the ALJ's decision by the Appeals Council on November 3, 2010.  Tr. 11.  On August 26, 2011, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 3-5.

## II.  Evidence

### A.    Medical Evidence

#### 1.    Treatment History

Claimant was born prematurely at 26 weeks of gestation.  Tr. 102, 201.  At time of birth, she weighed 792 grams, or approximately 1 pound, 12 ounces.  Tr. 194.  Because of her

premature birth, Claimant spent four months in the neonatal intensive care unit (NICU) at the Toledo Hospital. Tr. 194.

Hani Haidar, M.D., Claimant's treating pediatrician, began treating her in January 2004, when she was two months old.  Tr. 188-89.  Dr. Haidar treated Claimant for various medical conditions through August 2007, including upper respiratory infections and asthma.  Tr. 170-88. For example, on January 11, 2006, Dr. Haidar examined Claimant and noted fine crackles and wheezes in all lung fields.  Tr. 178.  On June 19, 2006, Dr. Haidar saw Claimant and observed there were coarse breath sounds with wheezes and crackles.  Tr. 176.  On June 12, 2007, Dr. Haidar noted wheezing all over.  Tr. 170.

In November 2007, Dr. Haidar completed a questionnaire for the state agency and reported that Claimant had asthma with wheezing and coughing since infancy.  Tr. 164.  He stated that this condition was treated with an Albuterol[1] nebulizer and Pulmicort.[2]  Tr. 165.  He also noted that there are no issues of compliance that interfere with treatment.  Tr. 165.

Dr. Haidar continued to treat Claimant from August 2007 through March 2010.  At examinations in November 2007 and December 2007, and late August 2009, Dr. Haidar noted that Claimant had wheezing.  Tr. 162, 166, 252.  The wheezing occurred at times when Claimant had asthma flare-ups or exacerbations.  Tr. 162, 166, 252.  However, during examinations in late April 2008, December 2008, January 2009, April 2009, July 2009, and early August 2009, Dr. Haidar noted no evidence of any wheezing.  Tr. 158-61, 251-54.  Dr. Haidar prescribed Albuterol four times a day or every four to six hours in December 2007 and August 2009 when Claimant

---

[1]  Albuterol is a bronchodilator that is used to prevent and treat wheezing, difficulty breathing, and chest tightness caused by lung diseases, such as asthma and chronic obstructive pulmonary disease.  *See* MedlinePlus, "Albuterol Inhalation," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html.  Albuterol comes as a solution (liquid) to inhale by mouth using a nebulizer and as an aerosol to inhale by mouth using an inhaler.  *Id.*

[2] Pulmicort, the brand name for budesonide, is a corticosteroid inhaler and is used to prevent wheezing, shortness of breath, and troubled breathing caused by severe asthma and other lung diseases.  *See* MedlinePlus, "Budesonide Oral Inhalation," *available at* http://www.nlm.nih.gov/medlineplus/print/druginfo/meds/a699056.html.

had exacerbations. Tr. 167, 252.  Otherwise, she was to take Albuterol on an as-needed basis.
Tr. 135, 166.  Dr. Haidar also prescribed Oraped[3] and Singulair.[4]  Tr. 137, 166, 250, 252-53.

Claimant was hospitalized from On April 16, 2008 to April 18, 2008 for pneumonia.  Tr.
137.  She improved with treatment and was discharged on a five day course of Oraped.  Tr. 137.

On December 13, 2008, Claimant went to the emergency room with a chief complaint of
chest pain.  Tr. 135.  It was noted that Claimant was taking Pulmicort, Albuterol as needed, and
Singulair.  Tr. 135.  She was diagnosed as having chest wall pain and was prescribed Motrin for
treatment.  Tr. 136.  On examination, her lungs were clear to auscultation without wheezes, rales,
or rhonchi.  Tr. 135.  In follow-up examinations with a pediatric cardiologist in April 2009 and
October 2009, it was noted that Claimant was doing well from a cardiac point of view and that
her intermittent complaints of chest pain were not of cardiac origin.  Tr. 260, 262.  Claimant was
described as "a healthy looking" five year old child in "no respiratory distress," who complained
of occasional shortness of breath.  Tr. 260-62.  Her lungs were clear to auscultation.  Tr. 262.
The doctor stated that there was no need to limit Claimant in any of her activities.  Tr. 260-62.

On October 8, 2009, Ramalinga P. Reddy, M.D., a pediatric pulmonologist, at the request
of Dr. Haidar, evaluated Claimant in relation to her intermittent episodes of coughing and
wheezing.  Tr. 201-06.  On examination, Dr. Reddy noted that Claimant's chest was clear to
auscultation, but that she had air trapping by both clinical exam and by chest x-ray.  Tr. 201, 230.
A pulmonary function test was attempted, but Claimant's effort was inconsistent with an
adequate study.  Tr. 201.  Dr. Reddy noted, however, that the slope of the flow volume loop did

---

[3] Oraped, also known as Prednisolone, is an oral corticosteroid that is used to treat a number of different conditions,
including worsening of asthma symptoms (an asthma attack).  *See* "Prednisone and Asthma," *available at*
http://www.webmd.com/asthma/guide/prednisone-asthma.

[4] Singulair, is a leukotriene receptor antagonist that is used to prevent the breathing difficulty, chest tightness,
wheezing, and coughing caused by asthma.  It is also used to treat symptoms of allergic rhinitis. *See* MedlinePlus,
"Montelukast," *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600014.html.

not show any severe small airway obstruction.  Tr. 201.  He diagnosed Claimant as showing

evidence of moderate persistent asthma and seasonal allergic rhinitis.  Tr. 201.  He also adjusted

Claimant's medications and recommended further testing, including allergy testing.  Tr. 202.

At a follow-up examination on February 12, 2010, Dr. Reddy stated that Claimant was

"doing well" since her last visit.  Tr. 240, 278.  He noted that Claimant was taking Pulmicort in

the aerosol form, Singulair on a regular basis, and Albuterol on an as need basis.  Tr. 240.  Dr.

Reddy stated that since he last examined Claimant in October 2009, there had not been any visits

to the emergency room for asthma exacerbations or need for systemic steroids, even though

Claimant had a sinus infection in December 2009.  Tr. 240.  On examination, Claimant's chest

was clear, including no indication of wheezing.  Tr. 240, 278.  She had thick nasal secretions

with boggy mucosa.  Tr. 240.  Dr. Reddy reviewed Claimant's asthma action plan and discussed

doing pulmonary function studies and switching Claimant to inhalers.  Tr. 240.

On March 22, 2010, Claimant was treated in the emergency room for a cough and fever.

Tr. 238-39.  She was diagnosed as having an upper respiratory infection and pneumonia in her

right lower lobe.  Tr. 219-20, 239.  On examination, Claimant's lungs were clear to auscultation

bilaterally.  Tr. 238.

In addition to her asthma, Claimant also developed bladder spasms and was treated for a

bladder disorder beginning in 2009.  Tr. 241-48, 253-54.  Claimant had enuresis, particularly at

night, and experienced problems with frequency and dribbling.  Tr. 247.  She had to wear pull-

ups (training pants) at all times.  Tr. 247.  In May 2009, Claimant underwent a urology

evaluation and was diagnosed with dysfunctional elimination syndrome and bladder instability.

Tr. 246-47.  Claimant was started on medications to treat her condition.  Tr. 241-46. By March

2010, Claimant's treating physicians reported that her condition had much improved and that she

was not having enuresis or dysuria.  Tr. 241.

Claimant was also diagnosed and treated for a seizure disorder.  Tr. 132-33, 194-95, 257, 263-64.  She was initially evaluated on January 23, 2009, for an episode of seizure-like activity at school with a staring episode and some generalized body shaking.  Tr. 132-33.  A diagnosis of new-onset seizure was made.  Tr. 128, 133.  An electroencephalogram ("EEG") performed on February 4, 2009, revealed abnormal findings that suggested a mild encephalopathy with at least some potential for underlying irritability.  Tr. 156.  Claimant had subsequent seizures lasting two to three minutes and characterized by staring spells.  Tr. 190, 194.  A neurological examination was performed by James E. Sander, M.D., on February 24, 2009.  Tr. 194-95.  Dr. Sander noted that Claimant had a normal examination with a history that sounded like epilepsy, partial complex type.  Tr. 195.  He prescribed Topamax, an anti-convulsant, for treatment.  Tr. 195.  In a subsequent examination on December 15, 2009, it was noted that Claimant had not had any recent seizures and was doing "okay" in Kindergarten.  Tr. 263.  Another EEG performed on December 18, 2009 was within normal limits with no seizure activity in the awake state. Tr. 257.

### 2.    State Agency Physicians

On August 8, 2007, Malika Haque, M.D., a state agency medical consultant, reviewed Claimant's medical records and completed a Childhood Disability Evaluation Form.  Tr. 109-14. She concluded that Claimant's impairments did not meet, medically equal, or functionally equal the Listings.  Tr. 109.  She found that Claimant had no limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for yourself.  Tr. 111-12.  She found that Claimant had a less than marked limitation in the domain of health and physical well-being.  Tr. 112.  Dr. Haque stated that Claimant's growth and development were both normal.  Tr. 112.  She

noted that Claimant had been treated for asthma, but that she had no emergency room visits for asthma in the past year. Tr. 112. She also stated that "medical improvement has occurred on this claim." Tr. 112.

On December 10, 2007, state agency medical consultant John L. Mormol, M.D., also reviewed Claimant's medical records and completed a Childhood Disability Evaluation Form. Tr. 115-20. He concluded that Claimant's impairments did not meet, medically equal, or functionally equal the Listings. Tr. 115. He found that Claimant had no limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for yourself. Tr. 117-18. He found that Claimant had a less than marked limitation in the domain of health and physical well-being. Tr. 118. Dr. Mormol noted that Claimant had been treated for asthma and premature birth, and that she was granted disability due to her premature birth. Tr. 118. He also noted that Claimant received steroid treatments in the past for her asthma and that she had no emergency room visits in the past year. Tr. 118. He found that medical improvement had occurred. Tr. 118.

**B.      Testimonial Evidence**

On September 10, 2010, Plaintiff and Claimant appeared with counsel and testified at a hearing before the ALJ. Claimant stated that she was six years old and that she was in the first grade. Tr. 283. She stated that she could not remember the name of her teacher. Tr. 284-85. Claimant testified that she had lots of friends. Tr. 285. She stated that she liked to play piano. Tr. 285.

Plaintiff also testified regarding Claimant's medical impairments. Tr. 286-93. She explained that Claimant was born at 26 weeks of gestation and that her lungs were not fully

developed when she was born.  Tr. 287.  Plaintiff stated that Claimant has had asthma since she

was born.  Tr. 287.  Plaintiff testified that Claimant gets out of breath very quickly.  Tr. 287.

Plaintiff also testified that Claimant's breathing is affected by the weather - if it is too windy, she

has to wear a mask or, if it is too hot, she has to stay inside in the air conditioning.  Tr. 287.

Plaintiff stated that Claimant gets breathing treatments (Albuterol) every four hours and takes

Pulmicort two times a day.  Tr. 287.  Plaintiff noted that Claimant's wheezing is fairly constant

but worsens from time to time, especially when she gets a cold.  Tr. 288.

### III.  Standard for Childhood Disability

**A.     Childhood Disability**

The standard for evaluating a child's disability claim differs from that used for an adult.

42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec*., 37 F. App'x

146, 147 (6th Cir. 2002).  A child is considered disabled if he has a "medically determinable

physical or mental impairment that results in marked and severe functional limitations and can be

expected to result in death or has lasted or can be expected to last for a continuous period of not

less than 12 months."  42 U.S.C. § 1382c(a)(3)(C).  To determine whether a child is disabled, the

regulations prescribe a three-step sequential evaluation process.  20 C.F.R. § 416.924(a).  At Step

One, a child must not be engaged in "substantial gainful activity."  20 C.F.R. § 416.924(b).  At

Step Two, a child must suffer from a "severe impairment."  20 C.F.R. § 416.924(c).  At Step

Three, disability will be found if a child has an impairment, or combination of impairments, that

meets, medically equals or functionally equals an impairment listed in 20 C.F.R. Part 404, Subpt.

P, Appendix 1 (the "Listings").[5]  20 C.F.R. § 416.924(d).

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

In order to *meet* a Listing, the child's impairment(s) must be substantiated by medical findings shown or described in the listing for that particular impairment.  20 C.F.R. § 416.925(d) (emphasis added).  In order to *medically equal* a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment. 20 C.F.R. § 416.926(a) (emphasis added).

In order to *functionally equal* a Listing, the child's impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.[6] 20 C.F.R. § 416.926a(a) (emphasis added).  The Commissioner assesses all relevant factors, including (1) how well the child initiates and sustains activities, how much extra help he or she needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) how the child is affected by his or medications or other treatment. 20 C.F.R. § 416.926a(a)(1)(3). Further, in determining functional equivalence, the Commissioner considers how a child functions in his or her activities within six domains: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for yourself; and, (vi) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).

**B.**   **Continued Eligibility for Childhood Benefits**

The Commissioner must periodically review whether a disabled child continues to remain eligible for benefits. 42 U.S.C. § 1382c(a)(3)(H)(ii)(I); 20 C.F.R. § 416.994a.  The Commissioner follows a three-step process in reviewing continued eligibility for benefits.  At

---

[6] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than extreme."  *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*  An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation means "more than marked." *Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id*.

9

Step One, the Commissioner determines whether there has been any "medical improvement" in the impairments that the child had at the most recent favorable determination that he was disabled (commonly referred to as the comparison point decision or "CPD"). 20 C.F.R. § 416.994a(b). Medical improvement is "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable decision that [the claimant] was disabled or continued to be disabled ... based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [the claimant's] impairment(s)." 20 C.F.R. § 416.994a(c). If no medical improvement has occurred, the child continues to be disabled unless an enumerated exception applies. 20 C.F.R. § 416.994a(b)(1). If medical improvement has occurred, the Commissioner proceeds to Step Two. 20 C.F.R. § 416.994a(b)(2).

At Step Two, if the CPD was made on or after January 2, 2001 and was based upon functional equivalence to a Listing, as is the case here, the Commissioner need only determine whether the impairment(s) now functionally equals the Listings. 20 C.F.R. § 916.994a(b)(2); Social Security Ruling ("SSR") 05–03p, 2005 WL 1041037. If the impairment still functionally equals a Listing, then disability benefits will continue. *Id.* If the impairment does not, the Commissioner will proceed to Step Three. *Id.*

At Step Three, the Commissioner must determine whether the child is currently disabled in accordance with the rules for determining disability for children. 20 C.F.R. § 416.994a(b)(3). In determining whether a child is currently disabled, the SSA will consider all of the impairments that the child now has, including those not had at the time of the CPD, or those that the Commissioner did not consider at that time. *Id.* In making this determination, the Commissioner must answer the following questions: (1) Does the child suffer from a severe impairment or

combination of impairments? (2) Do such impairments meet or medically equal the severity of

any listed impairment? (3) Do such impairments functionally equal a listed impairment? 20

C.F.R. § 416 .994a(b)(3)(i)-(iii).

## IV.  The ALJ's Decision

At Step One of his analysis for continued eligibility for childhood benefits, the ALJ noted

that the most recent favorable medical decision finding that Claimant was disabled – the

comparison point decision ("CPD") - was the determination on February 11, 2004.  Tr. 18.  The

ALJ noted that, at the time of the CPD, Claimant had the following medically determinable

impairments: low birth weight and bronchopulmonary dysphagia.  Tr. 18.  These impairments

were found to functionally equal a Listed Impairment.  Tr. 18.  The ALJ then found that, as of

August 1, 2007, there was medical improvement in the impairments that Claimant had at the

time of the CPD.   Tr. 19.  Under Step Two, the ALJ concluded that, since August 1, 2007, the

impairments Claimant had at the time of the CPD did not functionally equal the Listings.  Tr. 19.

Under Step Three, the ALJ considered whether Claimant was currently disabled.  The

ALJ found that, since August 1, 2007, Claimant had the following severe impairments: asthma,

bladder disorder, and seizure disorder.  Tr. 26.  The ALJ then determined that, since August 1,

2007, Claimant did not have an impairment or combination of impairments that met or medically

equaled a Listed Impairment.  Tr. 27.  Further, the ALJ found that, since August 1, 2007, the

claimant did not have an impairment or combination of impairments that functionally equaled a

Listing.  Tr. 28.   The ALJ therefore concluded that Claimant's disability ended as of August 1,

2007, and that Claimant had not become disabled again since that date.  Tr. 32.

## V.  Arguments of the Parties

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because he did not provide any explanation as to why Claimant's asthma did not meet or medically equal Listing 103.03.  In response, the Commissioner argues that the ALJ properly determined that Claimant's asthma did not meet or medically equal any Listing.

## VI.  Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

12

**B.      The ALJ's Determination that Claimant's Asthma Did Not Meet or Medically Equal a Listing is Not Supported by Substantial Evidence**

Plaintiff concedes that the original impairment for which Claimant was found to be disabled, low birth weight, has medically improved.  Doc. 15, p. 6.  Plaintiff's sole argument is that the ALJ erred in not specifically addressing whether Claimant's asthma met or medically equaled Listing 103.03.  Doc. 15, pp.  6-7.  The Commissioner contends that substantial evidence supports the ALJ's determination that Claimant's impairments, including her asthma, did not meet or equal a Listing.  Contrary to the Commissioner's argument, the ALJ failed to conduct a meaningful review of the medical evidence regarding Claimant's asthma and compare that evidence to the requirements of Listing 103.03.

Listing 103.03 describes asthma and subsection (C)(2) provides:

C.      Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:

* * *

2.      Short courses of corticosteroids that average more than five days per month for at least three months during a 12-month period[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 103.03(C)(2).  To meet or equal a listed impairment, an impairment must meet or equal in severity all of the listing's specified criteria.  *Sullivan v. Zebley*, 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.* at 530.

In this case, the ALJ found that Claimant had several severe impairments, including her asthma.  He then considered whether her impairments met or equaled a Listing, and found that they did not.  Tr. 27-28.  The entirety of the ALJ's consideration of Claimant's impairments is contained in a single paragraph:

> The claimant has no impairment which meets the criteria of any of the listed impairments described in Appendix 1 of the Regulations (20 C.F.R., Part 404, Subpart P, Appendix 1).  No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment.  The Administrative Law Judge has reviewed all of the evidence and concludes that the claimant's impairments, both singly and in combination, do not meet or equal the severity of any listing.  In reaching this conclusion, the undersigned has also considered the opinion of the Disability Determination Services (DDS) medical consultants who evaluated the issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion.

Tr. 27-28.  This analysis was insufficient because the ALJ did not even identify which Listings he considered, let alone explain how and why he determined that Claimant's impairments did not meet or equal the requirements for the relevant Listings.  With regard to her asthma, the ALJ did not discuss the requirements of Listing 103.03 or compare the evidence with those requirements to determine if Claimant's asthma met or equaled the Listing.  Instead, the ALJ made only a passing reference to the medical evidence and mentioned, without describing, that the findings and opinions of "treating or examining physicians" and "[DDS] medical consultants" supported his determination that Claimant's impairments did not meet or equal a Listing.  Without a discussion of the evidence regarding Plaintiff's asthma, which was found by the ALJ to be a severe impairment, in comparison to the requirements of Listing 103.03, as well as an explanation as to why the impairment does not satisfy the requirements of the Listing, the Court cannot conduct a meaningful review of the record, for it is unclear precisely *why,* in the ALJ's view, Claimant's asthma did not meet or equal the Listing.  Because this issue must first be determined by the ALJ, not the Court, a remand is required.

This case is similar to *Reynolds v. Comm'r of Soc. Sec*., 424 Fed. App'x 411 (6th Cir. 2011), in which the Sixth Circuit held that the ALJ erred in "failing to analyze Reynolds' physical condition in relation to the Listed Impairments."  *Id*. at 416.  In that case*,* the ALJ found that the claimant's "back pain" and "an adjustment disorder" were severe impairments.  *Id.* at *3.

14

He then continued to Step Three of the analysis for adult disability claims[7] and began with his conclusion: "Claimant does not have an impairment or combination of impairments which, alone or in combination, meet sections 1.00 or 12.00 of the Listings." *Id.*  He then thoroughly analyzed Reynolds' mental impairment, comparing her medical history and testimony to the section 12.00 of the Listing.  *Id.*  However, once the ALJ completed his analysis of Reynolds' mental impairment, he simply continued to the next step, providing no analysis of whether Reynolds' physical impairments met or equaled a Listing under section 1.00, despite his introduction concluding that they did not.  *Id.*  The Sixth Circuit found that the ALJ's failure to analyze Reynolds' physical condition in relation to the Listed Impairments was erroneous, as the ALJ skipped an entire step of the necessary analysis.  *Id.*   In reaching this conclusion, the Sixth Circuit explained:

> In short, the ALJ needed to actually evaluate the evidence, compare it to . . . the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

424 Fed. App'x at 415.[8]

Several district courts in this Circuit have cited and/or discussed *Reynolds* to support a remand in the face of an incomplete Step Three analysis. *See, e.g., Hunter v. Astrue,* No. 1:09 CV 2790, 2011 WL 6440762, at *3–4 (N.D. Ohio Dec. 20, 2011) (holding that a plaintiff is entitled to a remand where the ALJ made only a conclusory finding at Step Three with respect to

---

[7] Step Three of the analysis for continued eligibility for childhood benefits contains a requirement that the ALJ determine whether the child is currently disabled in accordance with the rules for determining disability for children. 20 C.F.R. § 416.994a(b)(3).  Under the analysis, the ALJ must determine if the child's impairments meet or medically equal the severity of any Listed Impairment, which is virtually identical to Step Three of the adult disability analysis.

[8] The Sixth Circuit indicated that these requirements follow from an ALJ's statutory duty, under 5 U.S.C. § 557(C)(3)(A), to "include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'"  *Reynolds*, 424 Fed. App'x at 414 (quoting 5 U.S.C. § 557(C)(3)(A)).  This "reasons requirement is both a procedural and substantive requirement, necessary in order to facilitate effective and meaningful judicial review." *Id.*

plaintiff's degenerative disc disease without discussing the record evidence concerning that disease in relation to the relevant listing); *Morgan v. Astrue,* No. 10–207–KSF, 2011 WL 2292305, at *4–7 (E.D. Ky. June 8, 2011) (where plaintiff had both physical and mental impairments, the ALJs failure to analyze plaintiff's physical impairments at Step Three makes review of the ALJ's decision impossible and the error is not harmless because it denied plaintiff an important procedural safeguard); *May v. Astrue,* No. 4:10CV1533, 2011 WL 3490186, at *8–10 (N.D. Ohio June 1, 2011) (Report and Recommendation) (holding the ALJ erred, requiring remand, where he failed to analyze plaintiff's physical condition in relation to the Listed Impairments and the court refuses to entertain the Commissioner's "post hoc rationale" for the ALJ's decision because "it is the opinion given by an administrative agency ... that is under the Court's consideration" (citations and quotation marks omitted)), *adopted,* No.2011 WL 3490229 (N.D. Ohio Aug. 10, 2011).

Notwithstanding the foregoing, the Commissioner contends that the evidence does not establish that Claimant's impairments satisfied the criteria for any Listed Impairment, including Listing 103.03(C)(2).  The Commissioner discusses at length the requirements under Listing 103.03(C)(2) in relation to the medical evidence and argues that Claimant's asthma does not satisfy the requirements for that Listing.  For example, the Commissioner argues that Pulmicort, an inhaled corticosteroid that Claimant was taking to treat her asthma, is not the type of corticosteroid contemplated in Listing 103.03(C)(2) and, as a result, that she did not satisfy the requirements of the Listing.  Unfortunately, the ALJ included no such analysis in his decision and the Court cannot entertain the Commissioner's *post hoc* rationalizations.  *S.E.C. v. Chenery,* 332 U.S. 194, 196 (1947) (a reviewing court must judge propriety of agency action "solely by the grounds invoked by the agency").

16

Finally, the Commissioner argues that any error by the ALJ in his analysis of whether Claimant's impairments met or equaled a Listing was harmless. This argument is unpersuasive. The ALJ's failure to explain why Claimant's impairments did not meet or equal a Listing is not harmless error because, if Claimant's impairments met or equaled Listing 103.03, she is disabled within the meaning of the regulations and is entitled to continue to receive childhood disability benefits; no additional analysis is necessary.[9] *See Reynolds,* 424 Fed. App'x at 416 (finding that ALJ's failure to evaluate the medical evidence under Step Three was not harmless).

In sum, the ALJ failed to conduct a meaningful review of the evidence regarding Plaintiff's asthma and compare it to the requirements of Listing 103.03. Remand is therefore appropriate so that the ALJ can conduct the appropriate analysis under Listing 103.03.

### VII. Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner should be REVERSED and REMANDED.

Dated: October 12, 2012

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[9] A full review and analysis after remand may not result in a disability finding but, without a meaningful explanation as to why Claimant's asthma does not meet Listing 103.03, this Court cannot rule out the possibility of a disability finding.

17